

**FILED**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUL 30 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CASSANDRA WASHINGTON )
) No.
)
)
*Plaintiff* ) JURY TRIAL DEMANDED
)
v. )
HUGHES SOCOL PIERS RESNICK & ) **1:18-cv-05162**
DYM, LTD. ) **Judge Edmond E. Chang**
) **Magistrate Judge Sheila M. Finnegan**
)
*Defendant.* )

## COMPLAINT

Plaintiff, Cassandra Washington ("Washington") complains of Defendant Hughes Socol Piers Resnick & Dym, Ltd ("HSPRD"), and seeks full and appropriate applicable judicial relief.

## JURISDICTION

1. Plaintiff raises federal claims under 29 U.S.C. § 1140, et seq. ("ERISA"). Jurisdiction is thus proper under 28 U.S.C. § 1331 and 28 U.S.C. § 2201. Supplemental jurisdiction is proper under 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred within the Northern District of Illinois and the Defendant resides in the Northern District of Illinois.

## PARTIES

3. Washington is an African-American female education administrator who lives in Chicago. Washington was more than forty years of age at all relevant times.

1

4. Defendant HSPRD is a law firm organized under Illinois law. It practices law in Illinois.

## FACTUAL BACKGROUND

5. Washington accepted employment with Chicago Public Schools ("CPS" or "Board") around early 1992 and has since held various roles including teacher, assistant principal and contract principal.

6. Washington is a certified and licensed school administrator and teacher in the State of Illinois. She earned tenure with CPS.

7. In or about February 2014, Washington entered into a valid and enforceable employment agreement with the Gale Local School Council ("LSC") in which Washington agreed to serve as Principal for Gale Elementary School from July 1, 2014 until June 30, 2018 ("2014 Contract").

8. Under the 2014 Contract, the Board was required to pay Washington an annual salary and all benefits for which full-time, regularly appointed certificated employees are eligible.

9. As is relevant to her claims, the 2014 Contract could only be terminated after a full due process hearing, or after a knowing and voluntary agreement of all the parties, including the LSC.

10. Washington performed all her obligations under the 2014 Contract at relevant times. Washington intended to work for CPS until she retired after 35 years of service.

11. Gale received Elementary and Secondary Education Act ("ESEA") Title 1 funds during the 2015-2016 school year and was subject to relevant provisions of the ESEA.

12. At relevant times, Washington developed, in collaboration with the LSC, a two-year continuous improvement work plan for Gale that was required by federal law, No Child Left Behind, ("Operative CIWP").

13. The Operative CIWP was approved by Washington's supervisors, the LSC, and CPS.

14. During the period covered by the Operative CIWP, Gale improved and Washington received favorable performance evaluations.

15. At relevant times, the Board had an unwritten policy whereby it systematically targeted experienced African-American female contract principals who were more than forty years of age for unjustified removal and dismissal from employment before the terms of their contracts expired so that it could replace them with politically connected, younger and cheaper candidates who were unlikely to exercise their first amendment rights. The Board carried out this policy by threatening to terminate the principals' contracts under 105 ILCS 5/34-8.3 and to make unjustified, false and disparaging comments attacking the principals' professionalism, even though the statute is suspect and does not permit termination of employment.

16. During the 2015-2016 school year, Washington was among the principals targeted for unjustified removal, false attacks and employment termination. Similarly-situated or substantially similarly-situated principals who are not African-American females more than forty years of age were not subjected to the policy described above.

17. In or around May 2016, even though he had never expressed any serious concerns with Washington's performance, Washington's supervisor, Philip Salemi

("Salemi"), stated to Washington that he was under a lot of pressure from CPS leadership to remove Washington from Gale.

18. In order to appear to justify Washington's removal from Gale, Salemi issued Washington an unwarranted and unreasonable Corrective Action Plan ("CAP") on or about May 10, 2016. The requirements of the CAP were unreasonable, unrealistic and inconsistent with the Operative CIWP. For example, Salemi directed Washington to ensure that a "minimum of 60% of K-2 students" met or exceeded established proficiency on TRC, an improvement of more than 440 per cent within a little more than a month.

19. The CAP was neither based on facts nor approved by Human Resources department as required by CPS policy in place at the relevant time.

20. Salemi wanted Washington to achieve certain unreasonable objectives in the CAP by August 8, 2016, including unrealistic improvements in student performance on standardized tests. The August 8, 2016 date and CAP objectives were unrealistic and unreasonable because results for student tests for the 2015-2016 school year would not have been available, and were in fact not available until sometime in October 2016.

21. On or about May 25, 2016, Washington exercised her first amendment rights by publicly opposing inequitable funding for public schools at a north side Chicago rally alongside parents and other members of the community. She spoke at the rally and encouraged attendees to stand up for the community's children. CPS was aware of Washington's participation in the rally because it was widely reported in the local media.

4

22. On or about May 2016, Washington opposed inequitable funding for public schools by CPS by symbolically rejecting, along with other members of the LSC, the budget that CPS allocated to Gale for the 2016-2017 school year.

23. On or about July 22, 2016, CPS contacted Washington through her union, Chicago Principals and Administrators Association ("CPAA") and demanded that she resign immediately as Principal for Gale and agree to leave CPS or that she would face involuntary termination of employment.

24. On or about July 27, 2016, the Board issued a public warning resolution against Washington in which it falsely accused her of having exhibited conduct unbecoming of a Principal. The Board unreasonably threatened to dismiss Washington from employment under 105 ILCS 5/34-85.

25. At relevant times, Washington requested the Board to withdraw, extend or modify the CAP in part to allow for student performance data for the 2015-2016 school year to become available, but the Board refused.

26. On or about July 29, 2016, Washington retained HSPRD to represent her in connection with her employment with CPS. HSPRD drafted and signed an agreement in which it agreed to advise Washington "regarding legal options and in severance negotiations with Chicago Public Schools."

27. On or about August 4, 2016, in order to induce Washington to agree to leave her position as Principal for Gale and CPS employment altogether, and in part in retaliation for Washington having exercised her first amendment rights to oppose inequitable funding of schools, CPS threatened to remove Washington from her position as Principal for Gale and to terminate her employment pursuant to 105 ILCS 5/34-8.3. 105

ILCS 5/34-8.3 does not permit termination of employment. The applicable uniform contract document that the CPAA negotiated with CPS was never intended to be used to terminate principals' employment under 105 ILCS 5/34-8.3.

28. On or about August 6, 2016, the Board drafted a written document that it presented to Washington through Defendant HSPRD for her signature in order to further induce and incentivize her to agree to leave her position as Principal for Gale and CPS employment altogether. The Board made material misrepresentations in the written document. Specifically, at a minimum, it:

    a. intentionally omitted that Washington had a right to a due process hearing before she could be removed from her position, and that it intended to conduct one or more hearings after August 6, 2016;

    b. intentionally omitted to advise Washington that it intended to use her signature on the document as a waiver of her due process rights;

    c. intentionally omitted to advise Washington that it did not intend to seek the LSC's consent in connection with the termination of her contract;

    d. intentionally omitted the fact that its 105 ILCS 5/34-8.3 hearing procedures, in violation of applicable law, do not allow for confrontation and cross-examination of witnesses even though they do not provide a prompt, post-termination procedure that would have allowed Washington to promptly pursue reinstatement in case of a wrong decision;

    e. intentionally misrepresented that Washington would continue to receive the salary and benefits guaranteed by her 2014 contract at relevant times; and

    f. intentionally misrepresented that the removal term under 105 ILCS 5/34-8.3 in Washington's written agreement with the LSC was intended to result in contract termination.

29. On or about August 9, 2016, CPS unlawfully removed Washington from Gale in part in retaliation for having exercised her first amendment rights. CPS replaced Washington with a younger, inexperienced individual who had never served as a principal anywhere, is unlikely to oppose inequitable funding of public schools, and is paid less than the salary Washington was legally entitled to.

30. Washington believes that she was unlawfully removed from Gale in part because of the fact that she exercised her first amendment rights to oppose inequitable funding for public schools, including Gale, both by the state of Illinois and by the Board.

31. Washington believes that she was unlawfully removed from Gale in part so that the Board did not have to pay her full employment benefits, including retirement benefits. Other similarly situated principals who did not speak out about the Board's inequitable funding policies or otherwise engage in protected activities were not removed from their schools.

32. The Board held hearings in October 2016 and December 2016 to purportedly consider terminating Washington's contract. On or about December 7, 2016, the Board falsely claimed in a publicly published document that Washington "waived her right to a hearing regarding her removal as Principal."

33. On or about November 2, 2016, the Board awarded pay increases to all principals effective September 6, 2016.

34. On November 26, 2016, the Board indicated to Washington that she is "not eligible for the" November 2, 2016 salary increase, depriving her of not just her salary, but her retirement benefits as well which are tied to her base salary. Washington was forced to hire an attorney and incurred legal fees in order to get some of the pay increase.

## LEGAL CLAIMS

## VIOLATION OF ERISA

35. Plaintiff repeats the allegations of paragraphs 1-34 of this complaint as though fully alleged herein.

36. At relevant times, Washington was a beneficiary of an ERISA Plan within the meaning of 29 U.S. Code § 1132(a).

37. During Washington's employment, the benefits that she participated in, or was eligible to participate in included one or more retirement plans, including one managed by a private company called Great-West Financial.

38. A substantial and more than *de minimis* number of employees of private companies, for example, those that manage Chicago area charter schools, were also eligible to participate in, and participated in the CPS benefit programs.

39. One of these private employers is Chicago Mathematics & Science Academy Charter School, Inc., which established and operates Chicago Math and Science Academy Charter School in Chicago.

40. The National Labor Relations Board has held in multiple cases, including as recently as August 24, 2016, that employers of charter school employees are [private] employers "within the meaning of Section 2(2) of the National Labor Relations Act."

41. The Board's retirement plans are subject to ERISA because they include more than *de minimis* participants who are employees of private companies.

42. CPS had one or more employee pension plans ("Plans") at relevant times which were available to its employees who had similar positions as Plaintiff.

43. At least one of the Plans constitutes an "employee welfare benefit plan," as that term is defined in 29 U.S.C. § 1102.

44. On or about August 13, 2013, the Board admitted in prior litigation, case No. 13-cv-04413, that CPS' [retirement] Plan constitutes an "employee welfare benefit plan," as that term is defined in 29 U.S.C § 1102.

45. At relevant times, it was unlawful under ERISA for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled or may become entitled under an ERISA plan.

46. Washington exercised a right to which she was entitled, or to which she could become entitled when she refused to resign from her position as Gale Principal and give up her ERISA benefits, including retirement benefits. Washington also exercised her rights under ERISA when she sought to oppose CPS' efforts to remove her from Gale, and thereby give up her employment benefits, including retirement benefits.

47. Defendant violated Washington's rights under ERISA by knowingly participating in the Board's discriminatory plan to deprive Washington of the full

9

retirement benefits that she would have received if she had worked for the Board until she retired after 35 years of service. The discrimination was based in part on Washington's age, race and participation in protected activity. Defendant participated in the Board's plan by encouraging Washington not to appear at a hearing on October 14, 2016 to oppose her removal based in part on the LSC's lack of consent. Defendant also participated in the Board's plan by not to appearing at a hearing on October 14, 2016 to oppose Washington's removal based in part on the LSC's lack of consent. Defendant further participated in the Board's plan by not asserting any defense on behalf of Washington against the Board's unlawful employment practices.

48. As a proximate or direct result of Defendant's conduct, Plaintiff has suffered damages, including, the deprivation of her retirement benefits, health benefits, vacation pay and wages, in violation of her rights under ERISA.

WHEREFORE, Plaintiff, Cassandra Washington, respectfully requests that, after a jury trial, this Court find in her favor and enter judgment against Defendant for damages caused by the Defendant's violation of her ERISA rights plus reasonable attorneys' fees and costs of this action.

## LEGAL MALPRACTICE

49. Plaintiff repeats the allegations of paragraphs 1-48 of this complaint as though fully alleged herein.

50. On or about July 29, 2016, an attorney-client relationship arose between Plaintiff and Defendant after Defendant agreed to represent Plaintiff, and Plaintiff accepted the offer by paying a retainer of about $2,500.

51. The attorney-client relationship between Plaintiff and Defendant gave rise to a duty of professional care and loyalty on the part of Defendant towards Plaintiff.

52. In breach and violation of that duty imposed upon Defendant as the attorney for Plaintiff:

    a. On or about August 2016, Defendant, through its employees or agents, failed to inform and advise Plaintiff that her pre-termination due process rights had been violated when CPS removed her from Gale without an opportunity to be heard or to be represented by an attorney;

    b. On or about August 2016, Defendant, through its employees or agents, failed to inform and advise Plaintiff that she could have opposed her removal from Gale because, among other reasons, it was initiated for the improper purpose of retaliating and discriminating against Plaintiff;

    c. On or about August 2016, Defendant, through its employees or agents, failed to fully and appropriately investigate the circumstances surrounding the improper CAP that CPS issued to Washington, including the possibility that it was not approved by the Human Resources Department as was required by CPS policies in place at the time;

    d. On or about August 2016, Defendant, through its employees or agents, failed to fully and appropriately investigate the statute upon which CPS sought to remove Washington from Gale and to competently advise her;

including the possibility that it was being unconstitutionally applied to Washington; that CPS did not have an objective standard that it used in applying the statute; and that it was preempted by the ESEA, a federal law which had a similar conflicting statutory scheme;

e. On or about August, 2016, Defendant, through its employees or agents, advised Plaintiff to sign a Settlement Agreement without fully explaining the legal implications of the document to Washington, including the possibility that it was possible she would not be able to get another job after she signed the document;

f. On or about August 2016, Defendant, through its employees or agents, advised Plaintiff to sign a Settlement Agreement that it knew or should have known would result in the Board violating her rights under the Equal Pay Act;

g. On or about August 2016, Defendant, through its employees or agents, advised Plaintiff to sign a Settlement Agreement that it knew or should have known could result in Washington waiving future claims against the Board that Washington did not intend to waive;

h. On or about September 2016, Defendant advised Washington not to appear at a hearing on October 14, 2016, in which CPS intended to allegedly consider her removal; and Defendant failed to appear at the hearing, leading CPS to assert falsely, that Washington had waived her right to be at the hearing;

    i. On or about August 2016, Defendant, through its employees or agents failed to include a clause in a Settlement Agreement it intended for Washington to sign to require the settlement to be subject to Board approval, as was required by law and the Board's practices at the time;

    j. On or about August 2016, Defendant, through its employees or agents failed to advise Washington that she could have litigated her claims, including for breach of contract, against the Board.

53. Defendant's failure to properly and appropriately advise Washington that the LSC's consent was required before her contract could be voluntarily terminated deprived Washington of the opportunity to fully leverage the LSC's support because the LSC was opposed to her removal.

54. As a proximate or direct result of Defendant's conduct as described above, Washington signed a document she did not and could not have fully understood; lost her job; and has not been able to find alternate employment; suffered damages, including loss of wages and retirement benefits. But for Defendant's conduct, the Board would have paid Washington for the entire duration or a substantial portion of the remainder of her contract.

WHEREFORE, Plaintiff, Cassandra Washington, respectfully requests that, after a jury trial, this Court find in her favor and enter judgment against Defendant for damages caused by the Defendant's legal malpractice in the course of her representation.

## JURY DEMAND

55. Plaintiff hereby demands a trial by jury of twelve pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cassandra Washington respectfully demands judgment against Hughes Socol Piers Resnick & Dym, Ltd as follows:

56. That Plaintiff be awarded equitable and/or legal relief as this Court deems appropriate under the circumstances.

Respectfully Submitted

*Cassandra Washington*

Cassandra Washington, *Pro Se*
9326 South Claremont Avenue
Chicago, IL 60643