UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CASSANDRA WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-05162 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| HUGHES SOCOL PIERS RESNICK & DYM, LTD., | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Cassandra Washington is a former Chicago Public Schools (CPS) principal who alleges that she was forced out of her position because of her race, gender, and age, and in retaliation for speaking publicly about school funding inequity. In this lawsuit, Washington now brings claims not against CPS, but against Hughes Socol Piers Resnick & Dym, Ltd.—the law firm that she hired to represent her in her termination proceedings against the CPS Board. R. 1, Compl.[1] According to Washington, Hughes Socol was actually conspiring with the CPS Board, even though the firm should have been advocating for Washington. So, she filed a complaint alleging that Hughes Socol violated the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, by helping CPS prevent her from obtaining certain retirement benefits. She also alleges that Hughes Socol committed legal malpractice.

---

[1]Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

Last year, this Court dismissed Washington's original complaint, though without prejudice. R. 27, Order on Mot. Dismiss. Washington has since amended her complaint, again alleging an ERISA claim and a legal malpractice claim, but also adding a claim under 42 U.S.C. § 1981.[2] R. 28, Am. Compl. Hughes Socol has filed another motion to dismiss all claims. R. 29, Mot. Dismiss. For the reasons discussed below, though, the Amended Complaint is also dismissed, this time with prejudice, and the Court will relinquish jurisdiction over the state-law claim.

## I. Background

For the purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Washington is an African-American woman who has worked for the Chicago Public Schools in various roles since 1992. Am. Compl. ¶¶ 3, 5. In February 2014, she signed a four-year contract to serve as the principal of Gale Elementary School from July 2014 through June 2018. *Id.* ¶ 7. Under the contract, Washington was supposed to be paid the salary and benefits of a full-time employee. *Id.* ¶ 8. The contract also outlined a process for termination, which could only happen after either a "full due process hearing" or the agreement of the parties *Id.* ¶ 9. Washington alleges that she performed her jobs duties adequately and that Gale Elementary improved during her tenure. *Id.* ¶¶ 12-14.

---

[2]The Court has federal question jurisdiction over the § 1981 and ERISA claims in this case under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367.

But Washington alleges that the CPS Board had "an unwritten policy whereby it systematically targeted experienced African-American female contract principals who were more than forty years of age for unjustified removal … so that it could replace them with politically connected, younger and cheaper candidates." Am. Compl. ¶ 15. Under this policy, the Board would threaten both to terminate the principals' contracts and to make false statements disparaging the principals' professionalism. *Id.* ¶ 16. And, relevant to this case, "the Board sometimes worked overtly in concert with, and in conspiracy with the principals' attorneys or representatives to achieve its purpose." *Id.* ¶ 17.

In May 2016, about two years into her contract, Washington believes she was targeted by this policy and gives a few reasons why. Am. Compl. ¶ 18. First, she says her supervisor told her that "he was under a lot of pressure from CPS leadership to remove [her]." *Id.* ¶ 19. Second, in order to justify her eventual removal, that same supervisor put her on a "Corrective Action Plan," which her allegations suggest was unwarranted, infeasible, and procedurally improper. *Id.* ¶¶ 20-22. And finally, in July 2016, Washington alleges that after she spoke publicly at a rally for public school funding, the Board "demanded that she resigned immediately" and "threatened to dismiss" her for "exhibit[ing] conduct unbecoming of a principal." *Id.* ¶¶ 23-26.

Here is where Hughes Socol comes in. After the Board demanded her resignation in July 2016, Washington retained the law firm "to represent her in connection with her employment with CPS." Am. Compl. ¶ 28. She hired the firm at

the recommendation of a CPPA representative.[3] *Id*. Washington then signed a retainer agreement stating that Hughes Socol would advise Washington "regarding legal options and in severance negotiations with Chicago Public Schools." *Id*.

In August 2016, the Board again threatened to terminate Washington's contract and drafted a settlement agreement for her to sign. Am Compl. ¶¶ 29-30. The Amended Complaint does not specify whether Washington actually signed the settlement agreement with the Board, but that same month, Washington was removed from her position as principal. *Id*. ¶ 31. Washington maintains that the Board removed her in retaliation for her public speaking and to avoid "pay[ing] her full employment benefits, including retirement benefits." *Id*. ¶¶ 32-33. According to Washington, other principals who did not speak out about inequitable funding were not removed from their schools. *Id*. ¶ 33. As a result of her removal, Washington did not receive a raise when the Board later decided to award pay increases to all principals in November 2016. *Id*. ¶¶ 35-36. Moreover, because her retirement benefits were tied to her salary, being denied the salary raise also affected her retirement benefits. *Id*. ¶ 36.

Around that same time, in October 2016 the Board held a hearing to consider terminating Washington's contract completely. Am. Compl. ¶ 34. This was "a critical due process hearing, where [Washington] could have objected to the proposed termination of her employment contract." *Id*. ¶ 38. But Washington missed that critical hearing because Hughes Socol *encouraged* her not to show up. *Id*. ¶¶ 38-39.

---

[3] "CPPA" stands for "Chicago Principals & Administrators Association," which Washington says is her union. Am. Compl. ¶ 25.

4

What is more, Hughes Socol itself then failed to appear on Washington's behalf. *Id*. ¶¶ 39, 68. As a result, in December 2016, the Board published a statement claiming that Washington "waived her right to a hearing regarding her removal as Principal." *Id*. ¶ 34.

Only later did Washington discover that Hughes Socol might have had a conflict of interest. According to Washington, the Hughes Socol attorney who was assigned to represent her was married to a CPS teacher. Am. Compl. ¶ 37. That teacher, in turn, was allegedly beholden to the CPS Board—the in-house CPS attorney who was handling Washington's termination proceedings "had enormous control and influence over" the teacher's career. *Id*. Because of "the relationship between the attorneys," Washington believes that it was "difficult" for Hughes Socol "to advocate vigorously on her behalf." *Id*. Moreover, Washington believes that throughout this process, Hughes Socol "employees and agents participated in one or more phone calls with the Board and its attorneys without [her] knowledge." *Id*. ¶ 43.

To sum up, Washington alleges that Hughes Socol failed to adequately represent her in fighting the termination. First, attorneys at Hughes Socol "encourage[ed] her not to appear at a hearing on October 14, 2016 to oppose" the termination of her contract at Gale Elementary. Am. Compl. ¶ 68. Second, Hughes Socol attorneys did not attend the hearing themselves. *Id*. And finally, Hughes Socol did not "assert[] any defense on behalf of Washington against the Board's unlawful employment practices." *Id*. What is more, alleges Washington, Hughes Socol provided her with inferior legal representation *because* she is African-American; a white client

5

would not have been treated the same way. *Id.* ¶ 47. Finally, Washington also alleges in her legal-malpractice claim that Hughes Socol failed to explain her rights to her, that they neglected to investigate several aspects of her termination, and that they wrongly advised her to sign the settlement agreement. *Id.* ¶¶ 74-75.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[4] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

6

speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

### A. ERISA

Turning first to the ERISA claim, Washington alleges that Hughes Socol violated § 510 of ERISA, which makes it unlawful to "discharge, fine, suspend, expel, discipline, or *discriminate* against a participant or beneficiary for exercising" particular rights. 29 U.S.C. § 1140 (emphasis added). As the Court explained in its previous order, the term "discriminate" as it appears in ERISA § 510 certainly encompasses more than the typical punishment that an employer might impose against an employee. Order on Mot. Dismiss at 6. But that does not mean there are no limits at all. *Id*. At the very least, the defendant must have caused the injury to the employee's ERISA benefits.[5] In the context of this case, then, Washington would have to allege that Hughes Socol was somehow involved in the CPS Board's scheme to force out Washington (which is what caused her alleged ERISA injury).

---

[5]As the Court previously explained, the legal standard here is informed by two Seventh Circuit cases, *Teamsters* and *Feinberg*. Order on Mot. Dismiss at 6-7. In *Teamsters*, the defendant-employer had hired a contractor, and the contractor in turn fired the plaintiff-employees; the Seventh Circuit held that the employer was not responsible under § 510 because the plaintiffs were employees of the contractor, and it was the contractor that made the decision to fire them, not the employer. *Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 826-27 (7th Cir. 2014). Similarly, in *Feinberg*, there was no § 510 liability where an employer opted to not assume pension liability for the plaintiffs when it acquired the company where they formerly worked. *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675-76 (7th Cir. 2011). The Seventh Circuit reasoned that the employer could not be held responsible under § 510 for failing to do something it never had any legal obligation to do in the first place and concluded that the employer's choice not to assume the pension liability failed to qualify as discrimination. *Id*. at 675-76.

7

This Court already concluded, though, that even assuming a law firm could be held liable under § 510 for helping an employer retaliate against an employee for their exercise of ERISA-protected rights, there were not enough facts in this particular case to create a plausible inference that Hughes Socol engaged in that type of retaliation with CPS against Washington.[6] Order on Mot. Dismiss at 7. Specifically, the Court explained that Washington had not pointed to any facts suggesting that "Hughes Socol had any relationship with the Board or any other reason to help the Board achieve its allegedly discriminatory or retaliatory goals." *Id.* at 7-8. Without some additional factual allegations, there was "no basis for an inference—at least on the facts alleged in the complaint—that Hughes Socol would have helped the Board remove Washington as principal." *Id.* at 8. In other words, there was a yawning gap between Hughes Socol's alleged conduct (encouraging Washington to not show up at her hearing and its failure to put forth any legal defense of Washington) and Washington's conclusion that Hughes Socol was thus working together with CPS to force her out of her job in violation of § 510.

Now, however, the Amended Complaint points to three additional pieces of information. Washington first alleges that, as a general matter, CPS "sometimes

---

[6]In its original motion to dismiss, Hughes Socol argued that it could not be liable to Washington under ERISA because it was not her employer. R. 11 at 2. But the Court explained that the Seventh Circuit has resisted holding that only employers can be liable for § 510 violations. Order on Mot. Dismiss at 5. *See also Teamsters*, 741 F.3d at 826-27 ("We are not saying that only employers can be liable for violating § 510—although some of our opinions can be read to suggest as much. As we have recently explained, this language was dicta, and any assumption that only employers can be liable under § 510 was ill founded.") (cleaned up); *Feinberg*, 629 F.3d at 675-76 (7th Cir. 2011) (explaining that an adverse action under § 510 need not even involve a direct interference with an employment relationship).

8

worked overtly in concert with, and in conspiracy with the principals' attorneys" to "achieve its purpose" in forcing out African-American women over the age of 40. Am. Compl. ¶ 17. Second, Washington alleges that the Hughes Socol attorney assigned to represent her was married to a CPS teacher, and that the CPS teacher's job security was subject to "enormous control and influence" by the in-house CPS attorney responsible for Washington's termination. *Id.* ¶ 37. And finally, Washington adds that Hughes Socol "employees and agents participated in one or more phone calls with the Board and its attorneys without Plaintiff's knowledge." *Id.* ¶ 43. So the question now is whether these new allegations are enough to fill in the missing pieces required to support a plausible inference that Hughes Socol conspired with the Board to remove Washington from her job.

Hughes Socol argues no, and the Court agrees. It is true that the bar for pleading race discrimination is relatively low. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 405-406 (7th Cir. 2010) (complaint only needs to identify the type of discrimination, by whom, and when). In other words, a "complaint merely needs to give the defendant sufficient notice to enable [it] to begin to investigate and prepare a defense." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008). But what that means in practice differs depending on the complexity of a case. For instance, "in many straightforward cases," it should not be "difficult" for a plaintiff to make out "an entirely plausible scenario, whether or not it describes what 'really' went on in this plaintiff's case." *Swanson*, 614 F.3d at 404-405. Employment discrimination is a helpful example; in that context, the assumption is that "[e]mployers are familiar

9

with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of these claims." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). In contrast, "[a] more complex case … will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected." *Swanson*, 614 F.3d at 405.

Here, Washington is not just putting forth a straightforward discrimination claim. Rather, she is alleging a much more complex discrimination *conspiracy* between her independently retained lawyer and her employer. Because this is not an ordinary discrimination claim, it requires more than the ordinary allegations to put the defendant on notice of what the case entails and to connect the dots in a plausible way. With this framework in mind, the Court turns to the new allegations in the Amended Complaint.

First up is the familial conflict of interest allegation. This is Washington's strongest argument. But even that is not enough to plausibly allege that Hughes Socol conspired with CPS to force Washington out of her role without a chance to defend herself in the due process hearing. For instance, even accepting as true that the CPS in-house attorney wielded "enormous control and influence" over the career trajectory of the Hughes Socol attorney's spouse, there is still nothing to suggest that that looming influence actually caused the Hughes Socol attorney's failure to defend Washington's case. That would require an inference that the CPS attorney somehow extorted the Hughes Socol attorney by either explicitly or implicitly threatening to

10

harm the spouse's job if the Hughes Socol attorney did not agree to sabotage Washington's defense. But that version of events is not supported by the alleged facts.

Nor does Washington explain how the conspiratorial dots are connected given that Hughes Socol only became involved in the case *after* the CPS Board had already started its campaign to terminate her. That is, Washington is essentially alleging that Hughes Socol worked together with CPS to sabotage her defense so that she could be wrongfully terminated from her job. But based on Washington's own allegations, the CPS Board's discrimination scheme was well underway by the time Hughes Socol entered the picture. So, Washington's theory assumes that Hughes Socol conspired with the CPS Board to maneuver itself into the Board's discrimination scheme, which would have depended entirely on convincing or tricking Washington into retaining the firm for legal representation in the first place. But that is implausible because Washington alleges that she decided to hire Hughes Socol based on the recommendation of the Chicago Principals and Administrators Association—her very own union. Am. Compl. ¶¶ 25, 28. And as far as the allegations go, there is no connection between the CPAA and CPS. It might be a different story, for instance, if it turned out that the *CPS Board* recommended Hughes Socol to all of its school principals facing termination, and then Hughes Socol suspiciously managed to lose every single case; that would be stronger support for an inference that CPS and Hughes Socol were somehow working together to force out certain school principals. But here, the allegations suggest only that Washington independently decided to retain Hughes Socol to defend her on the recommendation of her union.

For Hughes Socol to have the joined the conspiracy in that way would require scheming and planning to rival Sherlock Holmes' nemesis, Professor Moriarty. The fact that there exists a family relationship between Hughes Socol and CPS, without more, does not sufficiently move the needle toward an inference of conspiracy to discriminate.

The same goes for the phone-call allegation. Even accepting as true that Hughes Socol had made phone calls to the CPS Board and its attorneys, there is no suggestion that those phone calls entailed any discussion of a conspiracy to force Washington out of her job. And on that note, too, the fact that Washington has alleged that this conspiracy extends beyond just her case (and that CPS has overtly colluded with principals' attorneys on other occasions as well) is too general and abstract to support a plausible inference that in *this* case, Hughes Socol conspired with CPS to further a discrimination scheme against Washington.

Thus, the ERISA claim must be dismissed, and this time, the dismissal is with prejudice because Washington has already amended her complaint once.

### B. Section 1981

Washington also brings a race discrimination claim under 42 U.S.C. § 1981. In order to establish a *prima facie* claim of § 1981 discrimination, Washington must show that (1) she is a member of a racial minority; (2) Hughes Socol had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). Here, Washington is specifically targeting the adequacy of the legal

representation that she received from Hughes Socol. According to Washington, Hughes Socol discriminated against her by providing her inferior legal services compared to what they provide similarly situated white clients. R. 32, Pl.'s Resp. Br. at 4. Moreover, Washington alleges that Hughes Socol provided her inferior legal service because of her race. Am. Compl. ¶ 48.

Again, though, Washington's claim fails on the "intent to discriminate" requirement. To be clear, there is no dispute that Washington is a member of a racial minority and that she is challenging the services provided to her pursuant to a contract. But with regard to her argument that Hughes Socol provided her inferior legal representation *because of* her race, Washington really does not allege any facts that would plausibly support such an inference. Accepting the allegations in the Amended Complaint as true (as the Court must at the pleading stage), Hughes Socol certainly provided Washington with subpar legal representation: the law firm gave her the presumably incorrect advice to not show up to her own termination hearing, the firm *itself* did not show up to that same termination hearing, and then the firm failed to advance any sort of legal defense on Washington's behalf. But Washington still needs to somehow tie that conduct, with factual allegations, to a discriminatory motive. She fails to do that here.

Washington again cites *Swanson* for the proposition that all that is needed to plead race discrimination is the type of discrimination, by whom, and when." Pl.'s Resp. Br. at 6 (citing *Swanson*, 614 F.3d at 405-406). But again, this § 1981 claim against her lawyer is not the type of ordinary race discrimination case that Hughes

13

Socol can be expected to be "familiar with" and to "know how to investigate." *Carlson*, 758 F.3d at 819. Washington is not alleging, for instance, that Hughes Socol took an adverse employment action against her in an ordinary employment discrimination case. Rather, this case involves a much more convoluted series of allegations in which Washington is claiming that Hughes Socol provided her with worse legal representation than it provides to its white clients in order to further a broader discrimination scheme in collusion with her employer. Even without the CPS-collusion aspect of the discrimination claim, there are no *factual* allegations—as distinct from bare *conclusory* assertions—that give rise to a plausible inference that the firm treated non-Black clients better than Washington. So, even based on a notice-pleading standard, Washington must allege more than just "inferior legal representation" and then ask the Court to make the leap to discrimination.

So this claim is also dismissed, and the dismissal is also with prejudice. Even though Washington has not had the chance to amend *this* particular claim, she has been given the opportunity to amend her complaint as a whole. There is no general presumption that plaintiffs should be allowed to amend each of their individual claims, especially where, as here, Washington could have brought her § 1981 claim the first time around. Nor does she explain in the response brief what additional facts she would allege to state a plausible § 1981 claim. So, at this point, it is not in the

interests of justice to allow Washington to file a third version of her complaint. *See* Fed R. Civ. P. 15(a)(2).

### C. Legal Malpractice

With the federal claims dismissed, the only remaining claim is the state-law legal malpractice claim, and the usual presumption kicks in: "when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (*per curiam*) (citing cases). This presumption is reflected in 28 U.S.C. § 1367(c)(3), which provides for the discretionary relinquishment of jurisdiction over state claims when the claims providing original jurisdiction have been dismissed. Here, Counts 1 and 2 created federal-question jurisdiction, and Washington has not asserted diversity jurisdiction (nor does it appear that she could, because both sides likely are Illinois citizens). Given that there is no basis for jurisdiction without the federal claims, there is no good reason to hang on to the state claim: there will be no statute of limitations bar because of Illinois's savings statute, 735 ILCS 5/13-217, the Court has not spent significant judicial resources on the legal-malpractice claim, and it is not clear how it should be decided. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906-907 (7th Cir. 2007). Because the federal claims have been dismissed, the Court will also relinquish supplemental jurisdiction over the state-law claim. That means Washington may still try to pursue her legal malpractice claim in state court.

## IV. Conclusion

For the reasons stated above, both the ERISA and the § 1981 claims are dismissed, and the Court relinquishes jurisdiction over the state-law claims. The status hearing of April 30, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2020